**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

**VONTRESSA DENNIS**,

     Plaintiff,

v.                                              Civil Action No. 7:14-CV-132 (HL)

**D&F EQUIPMENT SALES, INC.**,

     Defendant.

**ORDER**

This case is before the Court on Defendant's Motion for Summary Judgment.  (Doc. 18).  After reviewing the pleadings, affidavits, depositions, and other evidentiary materials presented, the Court grants Defendant's motion in part and denies in part.

**I.      FACTUAL BACKGROUND**

This is a product liability action.  On August 14, 2013, Plaintiff Vontressa Dennis was working at the Sanderson Farms ("Sanderson") poultry processing plant in Moultrie, Georgia.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 2).  On this particular day, Ms. Dennis's supervisor instructed her to stand at a vertical conveyor, called a DFM500, to detect and remove any chicken breasts containing bones.  (DSOMF, Doc. 18-2, ¶¶ 2–3; Decl. of Vontressa Dennis, Doc.

26-1, ¶ 2; David M. Brani Rule 26 Report, Doc. 18-4, p. 3).[1]  Ms. Dennis had never worked at this location in the past.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 2).  Ms. Dennis positioned herself beside the DFM500, periodically removing breasts conveyed past her position.  (David M. Brani Rule 26 Report, Doc. 18-4, p. 3).  In order to perform this job, Ms. Dennis wore a glove on her right hand.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 2).

At some point during her shift, Ms. Dennis's right hand became entangled in the DFM500.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 2).  Ms. Dennis screamed and attempted to pull her hand out of the machine.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  Other workers, who were positioned at nearby workstations, came to Ms. Dennis's aid.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  Two employees, Montana Edwards and Todd Wise, tried unsuccessfully to turn off the machine.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  When these employees were unable to halt the machine, another employee began trying to pull Ms. Dennis's hand out of the machine.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  After several unsuccessful attempts, Ms. Dennis's coworker was able to pull Ms. Dennis's hand from the machine, amputating her right thumb near her palm in the process.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3; DSOMF, Doc. 18-2, ¶ 2).

---

[1] "DSOMF" refers to Defendant's Statement of Material Facts.  The cited paragraphs are those admitted by Ms. Dennis.

The DFM500 at which Ms. Dennis's injury occurred was designed and manufactured by Defendant D & F Equipment Sales, Inc. ("D&F"). (DSOMF, Doc. 18-2, ¶ 3). D&F is an equipment manufacturer working primarily in the food processing industry. (Dep. of D & F Equipment Sales, Inc., Doc. 18-6, p. 7). The DFM500 uses a moving belt that incorporates rigid paddles to transport product in a horizontal direction and then in a vertical direction upward. (David M. Brani Rule 26 Report, Doc. 18-4, p. 5). At the transition from horizontal to vertical motion, where Ms. Dennis was positioned, a fixed barrier guard creates a pinch point hazard between this guard and the moving paddles. (David M. Brani Rule 26 Report, Doc. 18-4, p. 5).

There is an intended workstation associated with the DFM500 located below the conveyor's discharge. At this workstation, employees are supposed to place the boneless breasts onto the adjacent conveying machine as the breasts exit the DFM500. (David M. Brani Rule 26 Report, Doc. 18-4, p. 6; John B. Holecek Rule 26 Report, Doc. 18-7, p. 7). If the employee detects bones in any of the breasts, they are set aside. (David M. Brani Rule 26 Report, Doc. 18-4, p. 6). The conveyor's intended workstation encompasses the tasks that Ms. Dennis was directed to perform; however, she was positioned at an area along the conveyor that was not intended to be a workstation. (David M. Brani Rule 26 Report, Doc. 18-4, p. 2; Dep. of George Jones, Doc. 18-8, pp. 46, 48, 55).

D&F did not equip the DFM500 with an emergency stop device ("e-stop"). (John B. Holecek Rule 26 Report, Doc. 18-7, p. 6). An e-stop is an electrical

control that, when triggered, immediately stops a piece of equipment. (Dep. of D & F Equipment Sales, Inc., Doc. 18-6, p. 24). An e-stop is "intended to minimize injuries that may result from operator inattentiveness or failure to perform as instructed and trained." (John B. Holecek Rule 26 Report, Doc. 18-7, p. 11). D&F does not manufacture or install e-stops on vertical conveyors. (Dep. of D & F Equipment Sales, Inc., Doc. 18-6, p. 25). And, although it has provided e-stops with other conveyors to Sanderson in the past (Dep. of George Jones, Doc. 18-8, p. 60), an e-stop was not provided with the DFM500 (John B. Holecek Rule 26 Report, Doc. 18-7, p. 6). Usually, Sanderson uses an outside contractor to perform all electrical work associated with the installation of machinery purchased from D&F. (Dep. of D & F Equipment Sales, Inc., Doc. 18-6, pp. 25–26, 28, 66). This outside contractor would install e-stops in locations chosen by Sanderson's plant safety manager. (Dep. of D & F Equipment Sales, Inc., Doc. 18-6, pp. 25–26, 66).

There are no government regulations or industry safety standards that require manufacturers, such as D&F, to install e-stops on vertical conveyors. The relevant regulations, contained in the Occupational Safety and Health Act of 1970 ("OSHA"), apply to employers. (John B. Holecek Rule 26 Report, Doc. 18-7, p. 10). The General Duty Clause of OSHA requires that a conveyor be "free from recognized hazards that are causing or are likely to cause death or serious physical harm" to users. (OSHA § 5(a)(1) (1970)). One means of meeting this requirement is through compliance with the Safety Standard for Conveyors and

4

Related Equipment ("Conveyor Standard").   Section 5.11.2(c) of the Conveyor

Standard provides:

> Remotely and automatically controlled conveyors and conveyors where operator stations are not manned or are beyond voice or visual contact from drive areas, loading areas, transfer points, and other potentially hazardous locations on the conveyor path not guarded by location, position, or guards shall be furnished with emergency stop buttons, pull cords, limit switches, or similar emergency stop devices.

ANSI/ASME B20.1-1990, § 5.11.2(c).

Although OSHA does not apply to manufacturers, D&F considers the

regulations when designing and manufacturing its equipment.   (Dep. of D & F

Equipment Sales, Inc., Doc. 18-6, p. 17).   Further, Sanderson relies on D&F to

provide equipment that is compliant with OSHA.   (Dep. of George Jones, Doc.

18-8, p. 31).   Despite this, neither Sanderson nor D&F considered designing the

DFM500 with an e-stop.   (Dep. of George Jones, Doc. 18-8, p. 53).   Nor does it

appear that either took steps to warn users of the risk of injury when working at

the location where Ms. Dennis was positioned.   Notwithstanding the lack of an e-

stop in the conveyor's design, both Sanderson and D&F maintain that the

DFM500 did not need an e-stop to comply with OSHA.   (DSOMF, Doc. 18-2, ¶¶

14–15).

Ms. Dennis filed a two-count Complaint on August 23, 2014, alleging that

D&F is strictly liable under O.C.G.A. § 51-1-11 for injuries she sustained as a

proximate result of the defective vertical conveyor, and is further liable for

negligently designing, marketing, testing, manufacturing, assembling, distributing,

5

selling, and installing the subject vertical conveyor.  (Compl., Doc. 1, ¶¶ 28–32).  Ms. Dennis filed an Amended Complaint on July 27, 2015, alleging the same two counts.  (Am. Compl., Doc. 25, ¶¶ 29–33).  In addition to these two counts, Ms. Dennis alleges that D&F "had a legal duty to warn the intended users" of the DFM500, and breached this duty by "failing to warn [Ms. Dennis] of its latent defects."  (Am. Compl., Doc. 25, ¶¶ 23–24).  D&F now moves for judgment in its favor on all claims.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is required where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute over such a fact is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  In making this determination, the court must view all of the evidence in the light most favorable to the nonmoving party, and draw all reasonable inferences in that party's favor.  Johnson v. Booker T. Washington Broad. Serv., Inc., 234 F.3d 501, 507 (11th Cir. 2000).  But, the court is bound only to draw those inferences which are reasonable.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646

(11th Cir. 1997) (quoting <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  <u>Anderson</u>, 477 U.S. at 249–50 (citations omitted).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must show the court that there is an absence of evidence to support the nonmoving party's case.  <u>Id.</u> at 325.  Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact does exist.  <u>Anderson</u>, 477 U.S. at 257.

**III.   ANALYSIS**

**A.    Strict Liability**

In Count One of her Amended Complaint, Ms. Dennis contends that she is entitled to recover damages pursuant to O.C.G.A. § 51-1-11 "for her personal injuries sustained as a proximate result of the defective vertical conveyor."  (Am. Compl., Doc. 25, ¶ 30).  In Georgia:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person who may use, consume, or reasonably be affected by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the

use intended, and its condition when sold is the proximate cause of
the injury sustained.

O.C.G.A. § 51-1-11(b)(1).  Three kinds of product defects result in a product that
is "not merchantable and reasonably suited to the use intended": design defects,
manufacturing defects, and marketing/packaging defects.  <u>Banks v. ICI
Americas, Inc.</u>, 450 S.E.2d 671, 672 (Ga. 1994).

Ms. Dennis alleges that D&F is strictly liable for manufacturing a vertical
conveyor that was defective and unreasonably dangerous because it lacked an
e-stop in the immediate vicinity of the conveyor's intended workstation.  (Am.
Compl., Doc. 25, ¶ 20).  She does not specify whether this defect is one of
design, manufacturing, or marketing/packaging.  D&F contends that summary
judgment is warranted on all potential claims, as to all alleged defects.  As a
result, the Court sees it best to consider whether summary judgment is
appropriate with respect to each category of defect, under Georgia's product
liability statute.

## 1.    Design defect

A manufacturer is strictly liable for a design defect when three
requirements are met: (1) the plaintiff was injured by a product manufactured by
the defendant; (2) the product was not "merchantable and reasonably suited to
the use intended" when the manufacturer sold it as a result of a design defect;
and (3) this design defect was the proximate cause of the plaintiff's injuries.  <u>See</u>
O.C.G.A. § 51-1-11(b)(1).  D&F does not contest that Ms. Dennis suffered

8

injuries as a result of getting her hand caught in the DFM500 it manufactured. (DSOMF, Doc. 18-2, ¶ 2).   It does argue, though, that the conveyor was not defective and that, even if it was, any defect was not the proximate cause of Ms. Dennis's injuries.  If Ms. Dennis has failed to establish a material question of fact as to either of these two issues, summary judgment is appropriate.

<em>a.    Defect</em>

To determine whether a device is defective, the Georgia Supreme Court introduced a risk-utility analysis, "whereby the risks inherent in a product design are weighed against the utility or benefit derived from the product." Banks, 450 S.E.2d at 673.    "This  risk-utility  analysis  incorporates  the  concept  of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk." Id.  "[T]he reasonableness of choosing from among various alternative product designs and adopting the safest one if it is feasible is considered the 'heart' of design defect cases . . . ." Id. at 674.

The Supreme Court of Georgia has provided an extensive, non-exhaustive list of factors for the trier of fact to consider when weighing the reasonableness of a product manufacturer's design choice. Id. at 675, n.6.  Among these factors are whether, when the product was manufactured, a safer, alternative design

existed[2]; "the usefulness of the product; the gravity and severity of the danger posed by the design; the likelihood of that danger; the avoidability of the danger . . . ; the user's ability to avoid danger; . . . the ability to eliminate danger without impairing the usefulness of the product or making it too expensive; and . . . . a manufacturer's proof of compliance with industry-wide practices, state of the art, or federal regulations . . . ."  Id.  A "product's risks and benefits will rarely be determined as a matter of law when any of the Banks factors is disputed."  Dean v. Toyota Indus. Equip. Mfg., Inc., 540 S.E.2d 233, 237 (Ga. Ct. App. 2000); see also Ogletree v. Navistar Intern. Transp. Corp., 522 S.E.2d 467, 470 (Ga. 1999) ("determination of a product's risks and benefits as a matter of law . . . 'will rarely be granted in design defect cases when any of these [risk-utility] elements is disputed'" (citation omitted)).

A number of factual disputes preclude summary judgment on Ms. Dennis's design defect claim.  Specifically, Ms. Dennis has provided evidence that a safer, alternative design existed when D&F manufactured the conveyor at issue in this case.  (Dep. of David M. Brani, Doc. 18-5, pp. 111–12 (explaining that other conveyor manufacturers installed e-stops on their devices); see also Dep. of George Jones, Doc. 18-8, p. 54 (stating that D&F has provided other equipment with e-stops to Sanderson Farms in the past)).  Additionally, Ms. Dennis has

---

[2] "Alternative safe design factors include: the feasibility of an alternative design; the availability of an effective substitute for the product which meets the same need but is safer; the financial cost of the improved design; and the adverse effects from the alternative."  Banks, 450 S.E.2d at 675, n.6.

presented evidence that D&F was not in compliance with industry-wide regulations. (David M. Brani Rule 26 Report, Doc. 18-4, p. 10 (expressing the opinion that "[t]he General Duty Clause of the Occupational Safety and Health Act of 1970 was not met" because "the Conveyor as installed by D&F failed to include a required Emergency Stop Device in the near vicinity of the Conveyor's workstation")). Finally, Ms. Dennis has produced evidence that the absence of an e-stop in D&F's design posed a grave risk of injury for operators that could have been minimized without impairing the usefulness of the machine. (David M. Brani Rule 26 Report, Doc. 18-4, p. 12 (opining that "[a]n emergency stop device is intended to minimize injuries that may result from operator inattentiveness or failure to perform as instructed and trained")). "In general, the weighing of the risk-utility factors is to be done *by the trier of fact*," Dean, 540 S.E. 2d at 237 (emphasis in original), and it certainly must be done so here.

### b.   Proximate Cause

For a manufacturer to be strictly liable for a design defect, a plaintiff's injuries must have been the proximate result of the defective product. "Unless the manufacturer's defective product can be shown to be the proximate cause of the injuries, there can be no recovery." Jonas, 210 F.Supp. 2d at 1377 (quoting Talley v. City Tank Corp., 279 S.E.2d 264, 269 (Ga. Ct. App. 1981)); see also Jonas v. Isuzu Motors Ltd., 210 F.Supp.2d 1373, 1377 (M.D. Ga. 2002) (under Georgia law, "[n]o matter how negligent a party may be, if their act stands in no causal relation to the injury it is not actionable.").

Questions of proximate cause are "undeniably . . . jury question[s] and may only be determined by the courts 'in plain and undisputed cases.'"  Sanders v. Lull Intern., Inc., 411 F.3d 1266, 1271 (11th Cir. 2005) (quoting Ontario Sewing Mach. v. Smith, 572 S.E.2d 533, 536 (Ga. 2002)).  Nevertheless,

> It is well settled that there can be no proximate cause where there has intervened between the act of the defendant and the injury to the plaintiff, an independent, intervening, act of someone other than the defendant, which was not foreseeable by defendant, was not triggered by defendant's acts, and which was sufficient of itself to cause the injury.

Walker v. Giles, 624 S.E.2d 191, 200 (Ga. Ct. App. 2005) (citations omitted).  An act is foreseeable if it "is objectively reasonable to expect, not merely what might occur."  Jonas, 210 F.Supp.2d at 1377.  "[T]he unforeseeable negligence of another person is an intervening cause that negates the liability of a manufacturer for an allegedly defective product."  Id. at 1379.  However, "[i]f the original negligent actor reasonably could have anticipated or foreseen the intervening act and its consequences, then the intervening act of negligence will not relieve the original actor from liability for the consequences resulting from the intervening act."  Lindsey v. Navistar Intern. Transp. Corp., 150 F.3d 1307, 1317 (11th Cir. 1998) (quoting Eubanks v. Busn. Equip. Ctr. of Atlanta, Inc., 288 S.E.2d 273, 274 (Ga. Ct. App. 1982)).

In its Motion for Summary Judgement, D&F argues that Ms. Dennis cannot establish a causal connection between any defect in the DFM500 and Ms. Dennis's injury, because there is no evidence that an e-stop would have

prevented the injury.  (Def.'s Mot. for Summ. J., Doc. 18-1, pp. 13–15).  In support of this argument, Defendant points out that: (1) an individual other than Ms. Dennis would have needed to trigger the e-stop, and it is not clear whether any employees were close enough to do so; and (2) it is impossible to say without speculation or conjecture whether Ms. Dennis's injury would have been minimized by the addition of an e-stop.  (Def.'s Mot. for Summ. J., Doc. 18-1, p. 15).

Ms. Dennis has produced evidence that "several other employees were working at their workstations near the location where" her injury occurred.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  Ms. Dennis stated that these employees were unable to turn the conveyor off, and eventually, one employee forcibly removed her hand from the machine by pulling on it.  (Decl. of Vontressa Dennis, Doc. 26-1, ¶ 3).  It is not the role of the Court to speculate as to whether these employees would have been able to turn off the DFM500 if there had been an e-stop, or as to whether the triggering of an e-stop would have minimized Ms. Dennis's injury.  These are questions of fact for the jury to decide.

D&F also appears to argue that, even if an e-stop would have minimized Ms. Dennis's injury, the fact that she was instructed to stand in an area that was not a designated workstation was an unforeseeable negligent act that negates D&F's liability as the manufacturer.  (Def.'s Mot. for Summ. J., Doc. 18-1, p. 8).  The question relevant to this argument is whether D&F could have foreseen that an employee might be working in the area where Ms. Dennis was standing.  This

13

is far from "plain and undisputed," and would require the Court to speculate as to D&F's knowledge of its customers' work-related decisions.   Accordingly, this issue should be dealt with by the trier of fact.

Finally, D&F argues that summary judgment is warranted on the design defect claim because a product manufacturer is only liable for injuries caused by its own manufactured product, not for the absence of or injuries caused by add-on safety devices.  (Def.'s Mot. for Summ. J., Doc. 18-1, p. 13).  In support of this argument, D&F cites two cases: Hall v. Scott USA[3] and Talley v. City Tank Corp.[4] Both of these cases are distinguishable from Ms. Dennis's claims.

Hall involved a lawsuit against the manufacturer of protective goggles worn during motorcross events.   400 S.E.2d at 700.   The goggles at issue had a cleaning device called "Roll-Offs by Smith," which was manufactured by a third party, attached to the lens.   Id.   The injury to the motorcyclist was caused by the Roll-Offs, not the goggle lens.   Id.   The Court of Appeals of Georgia held that the manufacturer of the goggles could not be held liable for the injuries the motorcyclist sustained, because "[a] manufacturer has the absolute right to have his strict liability for injuries adjudged on the basis of the design of its own marketed product and not that of someone else."   Id. at 703–04 (citation omitted).

Talley involved a lawsuit by a city employee against the manufacturer of a garbage truck.   279 S.E.2d at 266.   After the garbage truck was purchased by the

---

[3] 400 S.E.2d 700 (Ga Ct. App. 1990).
[4] 279 S.E.2d 264 (Ga. Ct. App. 1981).

city, the truck's coupling mechanism[5] was modified by the city's maintenance personnel to accommodate the design of its trash containers.  Id.  The city employee was killed by the uncoupling of the trash container from the back of the garbage truck.  Id. at 269.  It was undisputed that the original coupling mechanism as designed, manufactured, and sold was totally eliminated and replaced by another entirely different design during the city's modification.  Id. The Georgia Court of Appeals held that, where "the evidence is uncontroverted that the original design of the manufacturer's product has been totally eliminated and replaced so that the only similarity between the old and the new is the mere basic function to be performed," no issue of fact remains and summary judgment in favor of the manufacturer is warranted.  Id.

Both Hall and Talley involve product defects that resulted from modifications made to products after the time of purchase from defendant-manufacturers.  This case, on the other hand, involves a product that was allegedly defective *at the time it was manufactured*, because it failed to include an e-stop device.  Considering the factual dissimilarities between the cases cited by D&F and the claims presented by Ms. Dennis, the Court is not persuaded that an e-stop should be considered an add-on safety device.

---

[5] A garbage truck's coupling mechanism is the means by which the truck makes contact with a trash container and lifts the container off the ground at an angle such that the contents are dumped from the container into the truck.  See Talley, 279 S.E.2d at 266.

The issues raised by D&F regarding causation in its Motion for Summary Judgment are exactly the kind of "disputed" questions of proximate cause that should be left to the jury.   The Court denies D&F's Motion for Summary Judgement with respect to Ms. Dennis's strict liability design defect claim.

### 2.    Manufacturing defect

A manufacturing defect is one that is "measure[able] against a built-in *objective* standard or norm of proper manufacture." Banks, 450 S.E.2d at 673 n. 2 (emphasis in original).  In manufacturing defect cases, "it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use." Id. at 673.  "Thus, by definition, a manufacturing defect will always be identifiable as a deviation from some objective standard or a departure from the manufacturer's specifications established for the creation of the project." Jones v. Amazing Products, Inc., 231 F.Supp.2d 1228, 1236 (N.D. Ga. 2002).

The record is devoid of any evidence demonstrating that the DFM500 was improperly manufactured.  Even though Ms. Dennis alleges that the conveyor as manufactured was defective and unsafe, there is no indication that the product had a manufacturing defect specific only to the conveyor that was purchased and installed at Sanderson Farms.  In other words, the record does not support Ms. Dennis's allegation that the DFM500 was not manufactured in accordance with its design.  Simply alleging that a product is dangerous, absent evidence of a deviation from the intended design of the DFM500, is insufficient to demonstrate

the existence of a manufacturing defect.  See Center Chemical Co. v. Parzini,

218 S.E. 2d 580, 582 (Ga. 1975).  Accordingly, summary judgment is granted as

to Ms. Dennis's strict liability manufacturing defect claim.

### 3.    Marketing/packaging defect

A marketing/packaging defect does not carry its own set of criteria; rather,

it is a subset of a manufacturing or design defect, depending on the facts alleged.

Jones, 231 F.Supp.2d at 1237.  The United States District Court for the Northern

District of Georgia described this concept as follows:

> [I]f a container is faulty because it deviates from the manufacturer's
> specifications for a container or if a particular label is inadequate
> because it omits a line that is contained in the company's
> prototypical label, these flaws would be manufacturing defects.  If a
> container, however, is deemed faulty because the jury disagrees
> with the manufacturer's decision as to its design, the container would
> represent a design defect.

Id. at 1237–38.  As discussed supra, page 16, Ms. Dennis has not presented any

evidence to demonstrate that the at-issue DFM500 was any different than any

other DFM500 manufactured by D&F.  Therefore, no marketing/packaging defect

claim that would be akin to a manufacturing defect claim exists in this case.

Ms. Dennis has presented evidence, however, that D&F marketed the

DFM500 to Sanderson Farms as being OSHA-compliant.  (Dep. of George

Jones, Doc. 18-8, pp. 33–34; DSOMF, Doc 18-2, ¶¶ 14–15).  It is Ms. Dennis's

position that the conveyor was not OSHA-compliant, as advertised.  (David M.

Brani Rule 26 Report, Doc. 18-4, p. 10).  This alleged marketing defect is akin to

a design defect claim.  The theory is that the DFM500 was not reasonably suited

for the use intended because it was supposed to be an OSHA-compliant device, when in fact it was not. A manufacturer's compliance with industry-wide standards and regulations is one of several factors considered by the jury in evaluating a design defect claim. Banks, 450 S.E.2d at 675 n.6. Thus, instead of considering Ms. Dennis's marketing defect allegation as a separate marketing defect claim, it will be considered as one of many factors relevant to whether D&F is strictly liable for defective design, discussed supra, pages 8–16. See Jones, 231 F.Supp.2d at 1238 (treating plaintiff's marketing defect allegation and design defect allegation as a single claim, under theories of both strict liability and negligence).

## B.    Negligence

In Count Two of her Amended Complaint, Ms. Dennis alleges that D&F negligently designed, marketed, tested, manufactured, assembled, distributed, sold, and installed the subject DFM500. (Am. Compl., Doc. 25, ¶ 32). Ms. Dennis also alleges that D&F breached its duty to warn the intended DFM500 users of its defective condition. (Am. Compl., Doc. 25, ¶ 24).

To state a cause of action for negligence in Georgia, a plaintiff must establish the following: (1) a legal duty to conform to a standard of conduct raised by the law for the protection of others against unreasonable risks of harm; (2) a breach of this standard; (3) a legally attributable causal connection between the conduct and the resulting injury; and (4) some loss or damage flowing to the plaintiff's legally protected interest as a result of the alleged breach of the legal

duty.  Dixie Group, Inc. v. Shaw Industries Group, Inc., 693 S.E.2d 888, 895 (Ga. Ct. App. 2010).  It is undisputed that Ms. Dennis suffered damage in the form of the amputation of her thumb.  (DSOMF, Doc. 18-2, ¶ 2).  D&F's summary judgment motion contests, among other things, the duty, breach, and proximate cause elements.  The Court will address whether summary judgment is appropriate as to each of Ms. Dennis's negligence claims.

### 1.    Negligent Design

"Before negligence can be predicated upon a given act, some duty to the individual complaining must be sought and found, the observance of which duty would have averted or avoided the injury or damage."  Fletcher v. Water Applications Distribution Group, Inc., 773 S.E.2d 859, 863 (Ga. Ct. App. 2015) (citations omitted).  The duty can arise either through legislative enactment or common law.  Id. (citations omitted).  The existence of a legal duty is a question of law for the court.  Id. (citations omitted).

"Georgia law imposes an obligation upon everyone who attempts to do anything, even gratuitously, for another, to exercise some degree of care and skill in the performance of what he has undertaken."  Dixie Group, Inc., 693 S.E.2d at 895 (citations omitted).  For a product manufacturer, this means "a duty to exercise reasonable care in manufacturing its products so as to make products that are reasonably safe for intended or foreseeable uses[.]"  Fletcher, 773 S.E.2d at 863 (citations omitted). The Court concludes that D&F, as the manufacturer of the DFM500, owed a duty of reasonable care in manufacturing

the machine to all persons operating the machine in an intended or foreseeable manner.

Notably, the duty of reasonable care does not require a manufacturer to produce a product incapable of causing injury.  Banks, 264 Ga. at 736.  Rather, the determination of whether the duty has been breached relies on the same risk-utility analysis applicable in strict liability design defect claims.[6]  Ogletree, 522 S.E.2d at 469.  Because the risk-utility analysis is applicable to both strict liability and negligent design claims, Georgia courts have typically assumed design defect claims, whether based in strict liability or negligence, carry the same elements, as long as the alleged shortcomings in the product are the same. Jones, 231 F.Supp.2d at 1238.  The concepts of strict liability and negligence, with respect to a design defect claim, "cannot be treated as distinct theories of recovery."  Id.

This Court has already determined that summary judgment is not appropriate with respect to Ms. Dennis's strict liability design defect claim.  Not only do a number of material factual questions remain in dispute that are relevant to a risk-utility analysis,[7] but the Court has concluded that proximate cause is a question of fact that should be submitted to the jury in this case.[8]  Accordingly, the Court denies summary judgment with respect to whether D&F breached its

---

[6] Discussed supra, pages 9–10.
[7] See supra, pages 9–10.
[8] See supra, pages 11–16.

20

duty of reasonable care in designing the DFM500, causing injury to Ms. Dennis. Ms. Dennis's negligent design claim should, and will, be left to the trier of fact.

### 2.   Negligent Failure to Warn

The failure to warn is a type of design defect claim.  See Foskey v. Clark Equipment Co., 715 F.Supp. 1088, 1091 (M.D. Ga. 1989); Moore v. ECI Management, 542 S.E.2d 115, 120 (Ga. Ct. App. 2000).   However, courts consider the claim separate and apart from allegations of design defect, because the duty owed by the manufacturer is distinct.  "[T]he manufacturer of a product which, to its actual or constructive knowledge, involves danger to users, has a duty to give warning of such danger."  Battersby v. Boyer, 526 S.E.2d 159, 162 (Ga. Ct. App. 1999) (citations omitted).

> A product is not in a defective condition when it is safe for normal handling and consumption.  If the injury results from abnormal handling[,] the seller is not liable.  Where, however, he has reason to anticipate that danger may result from a particular use[,] he may be required to give adequate warning of the danger[,] and a product sold without such warning is in a defective condition.   However, there is no duty resting upon a manufacturer or seller to warn of a product-connected danger which is obvious or generally known. The same rule applies where it appears that the person using the product should know of the danger, or should in using the product discover the danger.  Whether a duty to warn exists thus depends upon [the] foreseeability of the use in question, the type of danger involved, and the foreseeability of the user's knowledge of the danger.  Such matters generally are not susceptible of summary adjudication and should be resolved by a trial in the ordinary manner.

Moore, 542 S.E.2d at 121 (citations and punctuation omitted).

A review of the record persuades the Court that material questions of fact remain unanswered as to the foreseeability of Ms. Dennis's use of the DFM500 and her knowledge of the danger.  It is not clear to the Court whether D&F should have known that a user might stand and work in the area where Ms. Dennis was standing and working.  Nor is it clear to the Court whether the danger of standing and working where Ms. Dennis was stationed was open and obvious to her. These questions should be left to the trier of fact.    Accordingly, summary judgment is denied as to Ms. Dennis's failure to warn claim.

### 3.    All Remaining Negligence Claims

In addition to her allegations of negligent design and negligent failure to warn, Ms. Dennis raises a laundry list of negligence claims in Count Two of her Amended Complaint.   Specifically, she asserts that D&F negligently marketed, tested, manufactured, assembled, distributed, sold, and installed the DFM500. (Am. Compl., Doc. 25, ¶ 32).   Beyond these bare allegations, Ms. Dennis has done nothing to develop these negligence claims.

The Court has concluded that D&F owed a duty of reasonable care to Ms. Dennis.   However, the burden is on Ms. Dennis to demonstrate that D&F breached that duty and that the breach caused her injuries.  Bradley Center, Inc. v. Wessner, 296 S.E.2d 693, 695 (Ga. 1982).   Ms. Dennis fails to offer any evidence to support her contention that D&F breached its duty of reasonable care with respect to the way it marketed, tested, manufactured, assembled,

distributed, sold, or installed the DFM500.   Accordingly, Ms. Dennis cannot survive summary judgment on these negligence claims.

## IV.   CONCLUSION

For the foregoing reasons, D&F's Motion for Summary Judgment is (Doc. 18) is denied with respect to Ms. Dennis's strict liability design defect claim, negligent design claim, and negligent failure to warn claim.   D&F's Motion for Summary Judgment is granted with respect to all remaining claims.

**SO ORDERED**, this the 31st day of March, 2016.

*/s/ Hugh Lawson*_____
**HUGH LAWSON, SENIOR JUDGE**

les